# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*  \*
NICOLE BAYLESS and LARRY       \*
BAYLESS, on behalf of SPENCER  \*     No. 08-679V
BAYLESS,                       \*     Special Master Christian J. Moran
                               \*
             Petitioners,      \*     Filed: January 15, 2015
                               \*
v.                             \*     Findings of Fact; contemporaneous
                               \*     records; testimony contradicting
SECRETARY OF HEALTH            \*     records; seizure disorder; onset.
AND HUMAN SERVICES,            \*
                               \*
             Respondent.       \*
                               \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*  \*

<u>Michael G. McLaren</u>, Black McLaren et al., Memphis, TN, for petitioners.
<u>Julia W. McInerny</u>, United States Dep't of Justice, Washington, DC, for respondent.

## RULING FINDING FACTS[1]

On September 25, 2008, Nicole and Larry Bayless on behalf of their son, Spencer, filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 through 34 (2006). In their petition, the Baylesses alleged that Spencer suffered a "table encephalopathy and an aggravation of his neurologic condition" as a result of the diphtheria-tetanus-acellular-pertussis ("DTaP") vaccination he received on October 4, 2005. Alternatively, petitioners alleged that Spencer suffered "a non-table encephalopathy and an aggravation of his neurologic condition" as a result of the DTaP vaccine. <u>See</u> Am. Pet. at 1.

---

[1] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this ruling on its website. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

To support their claim for compensation, petitioners periodically filed evidence including medical records, affidavits, and expert reports. The Secretary filed a responsive expert report, and the parties began planning for an expert hearing to be held in November 2011. Order, issued June 13, 2011. However, at petitioners' request, the scheduled hearing was cancelled and the Baylesses obtained a supplemental report from their expert. Later, the case was referred to another special master for alternative dispute resolution. Order, issued May 22, 2012.

The parties did not reach a resolution. In light of this, in February 2013, petitioners proceeded with filing additional evidence from their experts. On March 28, 2013, the case was reassigned to the undersigned. Following the filing of the respondent's second expert report, it became evident that the experts were assuming different facts regarding Spencer's condition following his October 4, 2005 DTaP vaccination through his November 28, 2005 hospitalization. See order, issued June 18, 2013; see also order, issued Oct. 1, 2013. Petitioners' expert, Dr. Tena Rosser, appears to credit assertions found in Mrs. Bayless's affidavit but not found in any medical record created around November 2005. In contrast, the Secretary's expert, Dr. Mary Anne Guggenheim, does not accept the accuracy of Mrs. Bayless's assertions. Compare exhibit 56 at 1-2, with exhibit A at 5, and exhibit D at 5.

When they are confronted with discrepancies among medical records and affidavits, special masters are encouraged to hold hearings to evaluate the testimony of the affiants. See Campbell v. Sec'y of Health & Human Servs., 69 Fed. Cl. 775, 779-80 (2006). A fact hearing was thus held on October 16, 2013, during which Mrs. Bayless as well as Spencer's maternal grandmother, Ms. Anke Bahuchet, testified in person. Spencer's maternal grandfather, Mr. Jacques Pierre, also testified by telephone from Brazil. Mrs. Bayless's and Ms. Bahuchet's in-person appearance allowed the undersigned to assess their demeanor. The undersigned also considered Mr. Pierre's tonal quality as he testified remotely at the start of the hearing.

Following the hearing, the parties submitted Joint Proposed Findings of Fact ("Proposed Findings") on April 30, 2014. Although the Baylesses referred to Spencer reaching milestones as described by What to Expect in the First Year, the Baylesses did not submit the pertinent chapters from this book. Consequently, to cure this omission, the undersigned filed relevant excerpts and allowed the parties to comment. Order, issued Dec. 23, 2014. Respondent did not submit any comment. The Baylesses submitted a comment which contained no objection, but

stated that they reserve the right to provide future comments and/or additional filings from the book as the matter continues.  Pet'rs' Comment on Exhibit 1001, filed Jan. 7, 2015.  Following this submission, findings of facts are ready to be made.

## Standard for Finding Facts

Petitioners are required to establish their case by a preponderance of the evidence.  42 U.S.C. § 300aa–13(1)(a).  The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence."  Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for finding facts in the Vaccine Program begins with analyzing the medical records, which are required to be filed with the petition.  42 U.S.C. § 300aa–11(c)(2).  Medical records created contemporaneously with the events they describe are presumed to be accurate.  Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Not only are medical records presumed to be accurate, they are also presumed to be complete, in the sense that the medical records present all the problems of the patient.  Completeness is presumed due to a series of propositions.  First, when people are ill, they see a medical professional.  Second, when ill people see a doctor, they report all of their problems to the doctor.  Third, having heard about the symptoms, the doctor records what he or she was told.

Appellate authorities have accepted the reasoning supporting a presumption that medical records created contemporaneously with the events being described are accurate and complete.  A notable example is Cucuras, in which the petitioners asserted that their daughter, Nicole, began having seizures within one day of receiving a vaccination, although medical records created around that time suggested that the seizures began at least one week after the vaccination.  Cucuras, 993 F.3d at 1527.  A judge reviewing the special master's decision stated that "[i]n light of [the parents'] concern for Nicole's treatment . . . it strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms.  It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of

seizures a week after they in fact occurred." Cucuras v. Sec'y of Health & Human Servs., 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F.2d 1525 (Fed. Cir. 1993).

Decisions by judges of the Court of Federal Claims have followed Cucuras in affirming findings by special masters that the lack of contemporaneously created medical records can contradict a testimonial assertion that symptoms appeared on a certain date. See, e.g., Doe/70 v. Sec'y of Health & Human Servs., 95 Fed. Cl. 598, 608 (2010) (stating, "[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), aff'd sub nom. Rickett v. Sec'y of Health & Human Servs., 468 Fed. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion); Doe/17 v. Sec'y of Health & Human Servs., 84 Fed. Cl. 691, 711 (2008); Ryman v. Sec'y of Health & Human Servs., 65 Fed. Cl. 35, 41-42 (2005); Snyder v. Sec'y of Health & Human Servs., 36 Fed. Cl. 461, 465 (1996) (stating, "[t]he special master apparently reasoned that, if Frank suffered such [developmental] losses immediately following the vaccination, it was more likely than not that this traumatic event, or his parents' mention of it, would have been noted by at least one of the medical record professionals who evaluated Frank during his life to date. Finding Frank's medical history silent on his loss of developmental milestones, the special master questioned petitioner's memory of the events, not her sincerity."), aff'd, 117 F.3d 545, 547-48 (Fed. Cir. 1997).

The presumption that contemporaneously-created medical records are accurate and complete is rebuttable, however. For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a first symptom appeared, despite the lack of a notation in a contemporaneous medical record. 42 U.S.C. § 300aa-13(b)(2). By extension, special masters may engage in similar fact-finding for cases alleging an off-Table injury. In such cases, special masters are expected to consider whether medical records are accurate and complete. To overcome the presumption that written records are accurate, testimony is required to be "consistent, clear, cogent, and compelling." Blutstein v. Sec'y of Health & Human Servs., No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998).

Special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony. The Court of Federal Claims listed four such explanations. Inconsistencies can be explained by: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical

professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist.  La Londe v. Sec'y Health & Human Servs., 110 Fed. Cl. 184, 203 (Fed. Cl. 2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014).

In weighing divergent pieces of evidence, special masters usually find contemporaneously-written medical records to be more significant than oral testimony.  Cucuras, 993 F.2d at 1528.  Testimony offered after the events in question is less reliable than contemporaneous reports when the motivation for accurate explication of symptoms is more immediate.  Reusser v. Sec'y of Health & Human Servs., 28 Fed. Cl. 516, 523 (1993).  However, compelling oral testimony may be more persuasive than written records.  Campbell, 69 Fed. Cl. at 779 ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Camery v. Sec'y of Health & Human Servs., 42 Fed. Cl. 381, 391 (1998) (this rule "should not be applied inflexibly, because medical records may be incomplete or inaccurate"); Murphy v. Sec'y of Health & Human Servs., 23 Cl. Ct. 726, 733 (1991) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance."), aff'd, 968 F.2d 1226 (Fed. Cir. 1992).

The relative strength or weakness of the testimony of a fact witness affects whether this testimony is more probative than medical records.  An assessment of a fact witness's credibility may involve consideration of the person's demeanor while testifying.  Andreu v. Sec'y of Health & Human Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009); Bradley v. Sec'y of Health & Human Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

These criteria are considered in the analysis below.

## Summary of Undisputed Facts

Spencer was born on June 2, 2005.  Exhibit 2 at 96.  To care for Spencer during the day while the Baylesses worked, they arranged for Ms. Bahuchet, Mrs. Bayless's mother, to come to their house.  Tr. 145, 166.  Ms. Bahuchet moved from Colorado to the Baylesses' home in California to tend to Spencer.  Tr. 54-55. Ms. Bahuchet described herself a "teaching parent" who was very involved with Spencer's daily routine.  Tr. 57.

On October 1, 2005, Ms. Bahuchet left the Baylesses' home ahead of the visit of ex-husband, Mr. Jacques Pierre. Tr. 60. Ms. Bahuchet used the opportunity to return to Colorado and complete packing up her house. Tr. 61. When Mr. Pierre and his wife visited their new grandson, Spencer had his four-month well-baby checkup with his pediatrician, Dr. Delmonteverde, on October 4, 2005. Tr. 20-22; exhibit 45 at 1-3; exhibit 2 at 90. During this check-up, Spencer received his second round of IPV, DTaP, Hib-Hep B, and Prevnar immunizations. Exhibit 2 at 90.

The parties do not dispute that on October 5-6, 2005, the two days following his four-month vaccinations, Spencer had a fever, cried often and was fussy and irritable. See Proposed Findings at 2; exhibit 25 at 14-15; exhibit 9 at 101; Tr. 150. Mrs. Bayless testified that Spencer's fever was gone by October 7, 2005. Tr. 157.

Mr. Pierre left on October 10, 2005. Tr. 22; exhibit 45 at 1. During the hearing, he testified about his observances of Spencer for the five days after vaccination. Tr. 30-38; see also exhibit 45 at 2.

Ms. Bahuchet resumed care-taking on October 12, 2005. Tr. 62. Ms. Bahuchet testified that she deferred to her daughter's judgment in matters involving Spencer's care, and that there were instances when their opinions differed causing a strain on their relationship. Tr. 71-72, 95-96, 155-56, 228-29.

Between October 5, 2005 and November 23, 2005, relatively few records were created. Mrs. Bayless made entries on various dates in Spencer's baby book and the Baylesses recorded video of Spencer's first Halloween. Exhibit 25; exhibit 26; exhibit 53. The witnesses provided their recollections about Spencer's health during this time, which is discussed in the section of disputed facts.

Mrs. Bayless averred that on November 23, 2005, she "noticed Spencer flexing his right arm in the morning… [and] thought he was flexing his muscle and that it looked cute. Over the next several days he continued to do this while bending his head forward." Exhibit 43 (second affidavit of Nicole Bayless) at 5.

The Secretary does not dispute that a few days before Spencer was taken to Torrance Memorial Hospital (TMH) on November 27, 2005, he began to have jerks or movements described as "twitching." Proposed Findings at 12-13 (citing exhibit 34 at 1-3, 6-7; exhibit 9 at 101; exhibit 10 at 40-41, 44-45, 85).

Thanksgiving occurred on November 24, 2005.  On the day after, the Baylesses took Spencer shopping during which Spencer moved erratically and Ms. Bahuchet thought he was having a seizure.  Tr. 76, 80-81,111-15, 124-26; exhibit 44 at 4-5.  The Baylesses created a video on November 27, 2005, then brought Spencer to TMH and provided a history to Spencer's treating physicians.  Exhibit 43 at 6; exhibit 34; Tr. 172.

On November 28, 2005, the Baylesses brought Spencer to Dr. Delmonteverde's office, where Dr. Chittenden saw Spencer.  Exhibit 9 at 101.  Later, Spencer was taken to Children's Hospital of Los Angeles (CHLA) where Spencer was seen by Dr. Rosser.  Dr. Rosser remains Spencer's treating neurologist and offered an opinion that the DTaP vaccine harmed Spencer.  Exhibits 56, 144.

The admission records from TMH and CHLA provide sufficient documentation to account for Spencer's condition from November 23, 2005 forward.

### Summary of the Parties' Arguments

The parties' dispute focuses on Spencer's condition in the several weeks following his October 4, 2005 vaccination for which there are no contemporaneous medical records.

The Baylesses assert that Spencer was a "normal healthy baby who achieved all of his developmental milestones" prior to his October 4, 2005 DTaP vaccination.  Exhibit 5 (first affidavit of Nicole Bayless) at 1.  The Baylesses claim that following the vaccination, Spencer stopped reaching milestones and began having many problems including a decreased appetite, listlessness with long periods of blank staring, irritability, sudden loss of use of his right hand, and episodes of "bad dreams."  See Proposed Findings.

In support of their allegations, the Baylesses have submitted medical records and affidavits in addition to their testimony and the testimony of Spencer's maternal grandparents.  The Secretary challenges the Baylesses' assertions and contends that the medical records do not support their assertions about Spencer's health.

With the exception of Spencer's gradual loss of the use of his right hand and staring, the undersigned finds that the medical records, including the admission

records from TMH and CHLA, provide sufficient documentation to account for his condition prior to November 23, 2005.

## Specific Findings of Fact

The topics covered by the parties' proposed findings are each discussed separately below.

### "Bad Dream" Episodes

The Baylesses assert that, starting October 5, 2005, and continuing until his November 28, 2005 treatment at CHLA, Spencer experienced "bad dream" episodes.   Proposed Findings at 2-3; exhibit 45 (affidavit of Jacques Pierre) at 2; Tr. 21.  The Secretary argues that there is no documentation, contemporaneous or otherwise, to support the assertion that Spencer was exhibiting this behavior. Proposed Findings at 2.

The Baylesses described that during these episodes Spencer would jerk awake from sleeping with a shake of his head from left to right, followed by screaming and crying.  The Baylesses assert these episodes, which they liken to awakening from a bad dream, happened several times a day.  Exhibit 45 at 2; Tr. 23-24.

The witnesses testified about their recollections of Spencer's bad dreams. Mr. Pierre recalls Spencer having bad dream episodes during his October 2005 visit and described Spencer's behavior during these episodes as abruptly awaking from sleep with left to right head shaking followed by intense crying.  Tr. 19-26. According to Mr. Pierre's recollection, these episodes did not cause the Baylesses to be concerned and were considered "normal."  Tr. 38.

Furthermore, when Ms. Bahuchet arrived back to the Baylesses' home from Colorado on October 12, 2005, she was not informed of any new or unusual behavior by Spencer during her absence.  Tr. 89-90.  Ms. Bahuchet resumed Spencer's daily care without any conversation about the bad dream episodes and by her account "everyone was acting like nothing happened after the vaccines." Tr. 97.  Ms. Bahuchet testified that she saw the jerking and bad dream episodes as Spencer would wake up, with high pitched crying like a "night terror," and that she recalled this occurring around the time she returned from Colorado.  Tr. 105-06.

Mrs. Bayless testified that these episodes occurred during her father's visit but that she assumed they were reflexes and medical care was not required.  Tr. 158.  Although Mrs. Bayless testified that Spencer had been having bad dream episodes and jerking himself awake starting October 5, 2005, she did not express concern to Spencer's primary physician, Dr. Delmonteverde.   For example, when Mrs. Bayless stopped into Dr. Delmonteverde's office on October 14, 2005, to retrieve a letter excusing her from jury duty, she did not mention any issues or arrange for an appointment.  Tr. 163-64; exhibit 2 at 89.

Standing by itself, this version seems coherent.  The Baylesses did not seek medical attention for Spencer's "bad dream" behavior because they did not understand the behavior was abnormal.

However, a problem with this version arises once additional evidentiary materials are considered.  The medical records created when the Baylesses began to realize that Spencer might be ill are inconsistent with their testimony.  One of the first doctors to see Spencer was Dr. May at TMH on November 27, 2005.  By this date, the Baylesses had already videotaped Spencer's aberrant movements and, thus, were worried about their child's health.  The Baylesses told Dr. May that Spencer's "twitching" seemed to occur when he woke from naps and had started the previous Wednesday, November 23, 2005.  Exhibit 34 at 1, 6.  Given that both the reported "twitching," and Spencer's bad dream episodes appeared to occur following naps, it seems that his parents would have been prompted to explain both to Dr. May.  Instead, the Baylesses reported only that Spencer's "unusual motor activity" was different from his "baseline."  Exhibit 9 at 102.

Dr. May ordered an electrolyte panel and bloodwork, then called Dr. Delmonteverde to review the results.  Id.  Dr. Delmonteverde and Dr. May agreed to send the Baylesses home with instructions to follow-up with Dr. Demonteverde's office the following day.  Id.  The following day Spencer was examined by Dr. Chittenden at Dr. Delmonteverde's office.  The history recorded by Dr. Chittenden indicated that Spencer's spasms began on Wednesday, November 23, 2005, and had progressed by Saturday November 26, 2005.  Id. at 101.  Dr. Chittenden referred Spencer to a pediatric neurologist.  Id.

Later that same day, Ms. Bahuchet observed Spencer having another "twitching" episode which led the Baylesses to take Spencer to CHLA.  Again, no report was provided describing weeks of bad dream behavior.  The Baylesses reported that Spencer was:

> [W]ell until 6 days ago (11/21/05) when he was first
> noted to have the right side of his body "crunch up."  His
> right eye would start to twitch, his right arm would flex
> and stiffen and his right leg would flex inward as well.
> This occurred *only right after he wakes up*.

Exhibit 10 at 44 (emphasis added).

The CHLA history is a third instance in which the parents provided a history about when Spencer's unusual waking movements began.  The CHLA history is relatively consistent with the TMH history; the former places onset at November 21, 2005, and the latter gives an onset of November 23, 2005.  Exhibit 10 at 44; exhibit 34 at 3.  This two-day discrepancy is not important.  What does matter is neither history even remotely suggests that the problem started in early October 2005.

Given the above, it is difficult to accept that Spencer routinely woke from sleep with abnormal screaming and head shaking as if aroused from a bad dream or "night terror."  It seems that if this were the actual severity of Spencer's typical behavior, the Baylesses and/or Ms. Bahuchet would have reported it to his treating physicians when care was sought in November 2005.  Moreover, given that the history provided included a newly observed behavior when waking, it is difficult to accept that his parents would not report other routine and abnormal behavior that also occurred as he woke.  Thus, it appears that the Baylesses and their witnesses are not accurately recalling the onset, severity, or frequency of Spencer's behavior.  The evidence, on the whole, does not support a finding that Spencer routinely awoke with abnormal "night terror" screaming, head shaking and inconsolable crying.

## "Milestones"

Mrs. Bayless claims that, according to her interpretation of What to Expect the First Year, Spencer was a "normal healthy baby who achieved all of his developmental milestones" before his four-month vaccinations.  Tr. 145; exhibit 43 at 4; exhibit 5 at 1.  Mrs. Bayless argues that Spencer stopped reaching "developmental milestones" following his four-month vaccinations.  Exhibit 34 at 4 ("When I read [What to Expect the First Year] near the end of October and beginning of November, when Spencer turned 5 months old, I noticed that he had not reached any new developmental milestones in the previous month.").

Ms. Bahuchet, in particular, expressed her strong personal belief that Spencer's development slowed following his October 4, 2005 vaccinations.  Tr. 57-72.  Ms. Bahuchet described herself as a "teaching parent" and oversaw Spencer's daily routine as his caregiver when Mr. and Mrs. Bayless were at work.  Tr. 66, 100-01, 166.  Ms. Bahuchet stated that upon her return from Colorado on October 12, 2005, Spencer was "a different child."  Tr. 66.  She gave several examples of what she believed to be causes for concern, stating that Spencer was "generally listless and uninterested to reach, kick and play with his toys."  Tr. 99-102; exhibit 44 at ¶ 10.

Ms. Bahuchet described Spencer's development before the October 4, 2005 vaccination as "advanced," and that there was a "huge contrast" in his development after vaccination.  Exhibit 44 at ¶ 7.  Ms. Bahuchet and Mrs. Bayless testified that their discussions about Spencer's alleged condition occurred frequently and caused stress between them.  Tr. 71-72, 96, 109, 132, 155-56, 166, 228-29.

Again, the Secretary contends that there is an absence of documentation, contemporaneous or otherwise, to support the Baylesses' assertions that Spencer stopped reaching "developmental milestones."  Proposed Findings at 9.  Moreover, the Secretary contends that Ms. Bahuchet and Mrs. Bayless lack the scientific and/or medical expertise to characterize the progression or lack thereof of Spencer's "developmental milestones."  Id. at 9, 12.

The milestones described in the popular "What to Expect" books are simple and easily observed.  See exhibit 1001 at 3-4 (Arlene Eisenberg et al., What to Expect the First Year 200-01 (1996)).  Given that a caregiver would not need to be a medical doctor to observe a child reaching these developmental milestones, the undersigned finds that Ms. Bahuchet and Mrs. Bayless are qualified to express an opinion as to whether Spencer could perform the actions described by in What to Expect.

The five-month chapter of What to Expect the First Year lists many milestones that an adult can understand.  Exhibit 1001 at 5-6.  However, neither Mrs. Bayless nor Ms. Bahuchet identified which of the specific milestones listed in What to Expect the First Year that Spencer failed to meet.  This lack of specificity greatly handicaps their testimony.

Even more importantly, it seems clear that Spencer could actually perform many of the events described in the five-month chapter of What to Expect the First Year.  When admitted to CHLA on November 28, 2005, Spencer was able to

perform many of the milestones listed, such as holding his head steady, rolling over, and reaching for objects. Exhibit 10 at 44 ("he raises his head more than 90 degrees… he is able to sit in a tripod position… is observed to roll over adequately… able to reach for a toy in the midline with no signs of shakiness"). Spencer is also seen supporting his own head in the Halloween video. Exhibit 53. The contradiction between Spencer's abilities as recorded in a medical record created in November 2005 and Spencer's abilities as recalled in either written or oral testimony created many years later greatly diminishes the value of that testimony. The Baylesses appear not to be remembering Spencer's abilities accurately.

<u>Loss of Appetite</u>

Mrs. Bayless testified that Spencer "didn't eat much at all" for the two days following his October 4, 2005 vaccinations. Tr. 150-52, 218. Mrs. Bayless recalled that although Dr. Delmonteverde had advised her to start Spencer on solid foods during his October 4, 2005 four-month check-up, she was unable to do so right away. Tr. 150-52.

Mrs. Bayless provided two reasons for not starting Spencer on a solid food diet until two-and-one-half weeks after Dr. Delmonteverde's recommendation. First, Mrs. Bayless explained that she might have tried to introduce Spencer to solid food that same day, but had not yet had the chance to buy infant cereal from the grocery store. Tr. 152. Second, Mrs. Bayless testified that, due to Spencer's fever the following two days, he was uninterested in eating and she thought he was not well enough for a new diet. Tr. 152. According to Mrs. Bayless, Spencer's appetite slowly returned and by October 22, 2005, she felt he was well enough to have him try solid food for the first time. Tr. 150-52.

Ms. Bahuchet testified that in her opinion Spencer's feedings became difficult following his October 4, 2005 vaccinations. Tr. 69. Mrs. Bayless testified that Spencer continued to have trouble eating and "did not want to take his bottles" through October 2005, which she attributed to her assumption that he was teething. Tr. 162, 218.

The Secretary does not dispute that Spencer started solids on October 22, 2005, but contends that there is a lack of evidence supporting the claim that Spencer's appetite was decreased following his vaccinations through October 22, 2005. Proposed Findings at 3.

During this period of time, Mrs. Bayless did not make additional notes in Spencer's baby book akin to the notes describing his fever and fussiness on October 5-6, 2005.  Additionally, the Baylesses did not contact Dr. Delmonteverde to report any change in Spencer's eating.  It is likely that if Spencer had not resumed more regular eating habits following his October 5-6, 2005 fever, Mrs. Bayless would have called Dr. Delmonteverde, as she claims to have done when Spencer's fever lasted more than a day.  Tr. 209-12.

Thus, it is likely that Spencer's eating habits improved during the time following his fever until he started solid foods on October 22, 2005, and continued to be relatively normal through November 2005.  Exhibit 34 at 1-2 (patient history given on Nov. 27, 2005 stating "patient has been taking good p.o.'s[2]"); exhibit 10 at 40-41, 48 (physical exam performed on Nov. 29, 2005: "Well nourished boy. Large for age").

<u>Loss of Right Hand Function</u>

The Baylesses claim that in the six to seven weeks following his four-month vaccinations, Spencer "suddenly" began using his left exclusively and fisting his right hand.  Exhibit 5 at 3.  Specifically, Spencer would rely on his left hand to sit up and play with toys.  Tr. at 127-29.  Mrs. Bayless testified that she attributed this behavior to Spencer being left handed and that it was not until his admission at CHLA that she realized he could no longer grasp with his right hand.  Exhibit 25 at 14; Tr. 127-29.

Although Spencer's admitting physicians at CHLA noted that he "[m]oves all extremities equally," on November 29, 2005, Spencer is seen in the Halloween trick-or-treating video resting in his mother's arms with his right hand in a fist.  Exhibit 10 at 41; exhibit 53.   The Secretary's expert addresses this stating:

> I suspect that the parental observations are true; indeed some asymmetric fisting of his right hand is noticeable on the video taken on Halloween. (Exhibit 53) Relative disuse (often interpreted as a preference for the opposite side) for one side of the body during this stage of brain development (typically at 4-6 months of age) is often a

---

[2] P.O. refers to "by mouth" feedings.  Neil M. Davis, <u>Medical Abbreviations</u> 261 (15th ed. 2011).

> more sensitive indicator of cortical dysfunction than a
> formal medical examination.

Exhibit D at 7.

The evidence supports a finding that at some point prior to the end of October 2005, Spencer began favoring his left hand and fisting his right hand.

### Staring and Listlessness

The Baylesses also assert that following his four-month vaccinations, Spencer began staring at objects for extended periods of time.  Examples of objects that fascinated him include a jack-o-lantern Halloween decoration, his hands, and his arms.  Tr. 126-27, 153-54, 168-69; exhibit 25 at 14 (baby book October 2005 notation: "I like our jack-o-lantern and like to stare at its flickering lights").  In her August 2011 affidavit, Mrs. Bayless alleged that Spencer began staring at his hands beginning around October 7, 2005.  Exhibit 43 at 3.  Mrs. Bayless described this behavior as lasting for seven weeks.  Exhibit 5 at 2-3.  During her testimony, Mrs. Bayless pointed to two examples of Spencer staring at his hand from the video taken of him during Halloween 2005.  Tr. 168-69 (discussing exhibit 53).

The Baylesses' witnesses also testified that Spencer's overall demeanor and personality changed following his October 4, 2005 vaccinations.  Exhibit 45 at 2; exhibit 44; Tr. 63-64.  Mr. Pierre testified that Spencer was not "a happy person" in the days following his vaccination and no longer played or smiled.  Tr. 26.  Mr. Pierre recalled that Spencer was not as "alert" as he was before his October 5, 2005 vaccination and would stare for long periods of time.  Tr. 39; exhibit 45 at 2.

Ms. Bahuchet testified that Spencer would stare "blankly" and no longer reached for his toys.  Tr. 70.  Ms. Bahuchet also testified that Spencer lost interest in playing and remained fussy in the weeks following his October 4, 2005 vaccination.  Tr. 68.

Mrs. Bayless testified that during the weeks following Spencer's vaccination, her mother made comments to her that Spencer's behaviors, including his staring and listlessness, were not normal.  Exhibit 44; Tr. 155, 166.  In response, she researched Spencer's behaviors, including the hand staring, on the internet until she was satisfied that Spencer was normal.  Tr. 212.  Mrs. Bayless explained that she preferred looking for answers on the internet because she was reluctant to see a physician and be considered a hypochondriac.  Tr. 229-30.

The Secretary does not dispute that Spencer stared at the family's jack-o-lantern decoration as indicated in Spencer's baby book. Exhibit 25 at 14. However, the Secretary contends that there is a lack of documentation in support of a finding that Spencer spent long periods of time staring at any object including his hand. Proposed Findings at 3.

It is clear from their testimony that Mrs. Bayless and Ms. Bahuchet worked closely in coordinating Spencer's care at this time. Tr. 70, 108,155, 166. They share a similar perspective and both clearly recall specific conversations and disagreements regarding Spencer's staring and listless behavior. In light of this, the evidence preponderates in favor of the Baylesses' allegation that from around October 7, 2005, and during the following seven weeks, Spencer stared at objects for long periods of time and appeared listless.

## Conclusion

The parties are ordered to provide these findings of fact to any expert whom they have retained to testify. Expert opinion inconsistent with these findings of fact is not likely to be persuasive. See Burns v. Sec'y of Health & Human Servs., 3 F.3d 415, 417 (1993) (holding that the special master did not abuse his discretion in refraining from conducting a hearing when the petitioner's expert "based his opinion on facts not substantiated by the record"); Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."); Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1376 n.6 (Fed. Cir. 1994) ("An expert opinion is no better than the soundness of the reasons supporting it."); see also Bradley v. Sec'y of Health & Human Servs., 991 F.2d 1570, 1574 (Fed. Cir. 1993) (the assumption of an expert about the accuracy of a fact witness's testimony does not "substantiate" the fact witness's testimony).

A status conference is set, sua sponte, for **Wednesday, January 28, 2015 at 11:00 A.M**. The parties should be prepared to propose the next step in this case.

Any questions may be directed to my law clerk, Mary Holmes, at (202) 357-6353.

**IT IS SO ORDERED.**

<u>s/Christian J. Moran</u>
Christian J. Moran
Special Master